## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN D. PATTERSON, et al., | ) | CASE NO. 5:08CV1300 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF AKRON, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| DEFENDANTS. | ) | |
| | ) | |

Before the Court is defendants' motion for summary judgment (Doc. No. 39), plaintiffs' brief in opposition (Doc. No. 51), defendants' reply (Doc. No. 54), plaintiffs' sur-reply (Doc. No.59), and defendants' reply to the sur-reply (Doc. No. 62). For the reasons set forth below, the motion is **GRANTED IN PART and DENIED IN PART**.

### I. BACKGROUND

Plaintiffs Derek Patterson ("Derek") and Brian Patterson ("Brian") grew up in Springfield, Ohio and graduated from Springfield High School in 1999 and 2002, respectively. Derek graduated from Ohio University in 2004 and moved to northern Florida, where he teaches algebra and geometry to grades 9 through 12 at Booker High School in Sarasota. He is also a youth counselor at the Sarasota Boys and Girls Club and an instructor in the Florida FCAT program. Brian attended Ohio University for two years and learned landscaping in Akron. In December 2005, Brian moved to Florida to live with Derek. He is employed as a landscaper by The Colony Gulf & Bay Club in Bradenton. (Derek Patterson Deposition ["DP Dep."] at 10-16; Brian Patterson Deposition ["BP Dep."] at 6-11.)

On Memorial Day weekend in 2006, Derek and Brian were visiting their parents in Springfield. On Saturday, May 27, 2006, sometime between 11:00-11:30 p.m., they each went separately with friends to Fat Tuesday (now Whiskey Dick's) which was next to Posh Nightclub (now Lux) on West Exchange Street near South Main Street in Akron.[1] It was a warm evening and the downtown bar district was crowded. Around 2:15 a.m. on Sunday, May 28, 2006, as people left the bars at closing time, they congregated outside on the street. (DP Dep. at 18-30; BP Dep. at 17, 21-22.)[2]

When Brian, who had been drinking that night,[3] came out of Fat Tuesday, he observed Derek leaning against a police cruiser parked in front of the bar. He joined him. Derek soon left to go talk to someone else and Brian remained, still leaning against the cruiser. Within seconds, defendant Givens came up to Brian and told him not to lean on the cruiser.[4] Brian immediately complied but, as Givens walked away, Brian resumed leaning on the cruiser and talking to his friend, Kara Monaghan. Givens returned, asked Brian why he was still leaning against the car, and told him to leave the scene or he would be arrested. Brian stated that he was not doing anything wrong and he would not leave. (BP Dep. at 23-29; Monaghan Dep. at 38-39.)[5]

---

[1] A schematic drawn by defendant Givens showing the immediate area is attached to plaintiffs' opposition brief as Exh. 5. (Doc. No. 51-12.)

[2] Both sides have submitted copies of surveillance camera footage from that night and have devoted a fair amount of argument to whether additional footage was destroyed by the defendants. Notwithstanding defendants' assertion in their reply brief (Doc. No. 54), that the videotape "quite clearly contradicts" plaintiffs' version of events, the Court finds the quality of the video to be so poor as to render the footage almost useless at the summary judgment stage. The Court has not relied on this footage and, should the case proceed to trial, it will be for the jury to decide whether or not the footage has any evidentiary value.

[3] Derek testified that he had not been drinking because he was the designated driver. (DP Dep. at 32.)

[4] Givens testified that Brian was sitting, not leaning, on the cruiser and that he asked him to "get off [of his] car." (Givens Dep. at 47-48.)

[5] According to Givens, Brian said: "I ain't leaving, and I ain't going to jail." (Givens Dep. at 55.)

Givens, assisted by defendants Rinn and Bickett, proceeded to arrest Brian. Brian's version of the events differs significantly from that of the officers. Brian claims that he quietly allowed them to arrest him and handcuff him behind his back. (BP Dep. at 30.) The officers claim that he fought them and, even after he was handcuffed, refused to allow them to place him in the cruiser, stiffening his body and pushing with his legs. This is confirmed by one of Brian's friends, Anthony Gary. (Givens Dep. at 68; Gary Dep. at 28-29.) In the meantime, Derek saw that Brian had been handcuffed and he asked Brian what was going on. When Brian did not answer, Derek approached Officer Rinn asking if he could just talk to his brother, which the officer permitted. Brian told Derek that he had done nothing wrong and did not know why he was being arrested. (DP Dep. at 43-45.)

The officers state that by this time, a yelling inebriated crowd was closing in.[6] The officers, fearing trouble, retreated with Brian into the middle of the street, followed by the crowd. (Givens Dep. at 70; Bickett Dep. at 28-29; Monaghan at 50-55.) The plaintiffs state that there was no provocation for "yanking" Brian into the street and that the officers unsuccessfully tried to "body slam" Brian to the ground. (DP Dep. at 46-47; Derek Patterson Declaration ["DP Decl."] ¶ 4; BP Dep. at 35-36.) Then Givens and another officer turned Brian to face defendant Evans, who shot him in the chest with a taser. (DP Dep. at 50; BP Dep. at 39.)

After being tased, Brian fell to the ground. (DP Dep. at 51.) Plaintiffs' friend, Anthony Gary, walked into the street and began taking pictures with his cell phone, announcing that it was police brutality. He was tased in the back and then handcuffed. (Gary Dep. at 34-35,

---

[6] There are varying accounts regarding the number of people gathered around the area. A friend of Brian's, Kara Monaghan, said there were 20-25 people (Monaghan Dep. at 51); Brian thought there were around 40 (BP Dep. at 27); Derek estimated about 100. (DP Dep. at 53.) Valet drivers in the area who observed what happened also differed in their crowd estimations, one saying "at least 20 people" were there, another saying "maybe its 50," and a third stating that "there were probably 200 people" in the area. (Kidder Aff., Item No. 1, p.2; Usinski Aff., Item No. 1, p. 4; Chermak Aff., Item No. 1, p. 2.)

36.) As Brian lay handcuffed and face down in the street, he states that Evans "drive stunned" him with the taser,[7] hitting him in the back, left leg and buttocks, while another officer had his knee on Brian's head. Someone's finger was in his left eye. (Brian Patterson Declaration ["BP Decl."], ¶ 3; BP Dep. at 38-41, 61-68.)

When Derek saw Brian getting tased, he "freaked out," jumping up and down and yelling at them. (Monaghan Dep. at 63.) He ran into the street and toward the officers, intending to pull the officers off Brian. (DP Dep. at 56.) Before he got to Brian, however, he was tackled by defendant Didyk and another officer. (DP Dep. at 57.) Derek landed on his hands and knees with the two officers pulling on his arms trying to pull them out from under him. (DP Dep. at 61.) Didyk drive stunned Derek on his thigh and buttocks; Derek fell on his face with his arms out and was handcuffed. (DP Dep. at 62-64; Didyk Dep. at 35-38.) Derek claims he was then drive stunned at least two more times. (DP Dep. at 64.) The officers claim that, during this struggle, Brian broke free from the officers and kneed Bickett in the head. (Bickett Dep. at 38-41; Evans Dep. at 34-35.) The officers state that an unruly crowd had gathered and was yelling obscenities and "police brutality." The crowd was pepper sprayed. (Meech Use of Force Report, Doc. No. 39-6 at p. 26.) In the end, the police officers charged Brian with assault on a police officer (F-4), resisting arrest (M-1), disorderly conduct--violent and turbulent behavior (M-4), and disorderly conduct--intoxication (MM), and Derek was charged with disorderly conduct--violent and turbulent behavior (M-4), obstructing official business, and resisting arrest.

On May 30, 2006, Derek was indicted by a grand jury on charges of disorderly conduct, obstructing official business, and resisting arrest. He entered a plea of "no contest" to

---

[7] Defendant Didyk, who also admitted he drive stunned Derek, described the process as follows: "The Taser has a cartridge on the front. It can be taken off. The cartridge is what would actually shoot the probes or the wires. I took that off and just used the Taser and made contact with the Taser to his back without using the probes." (Didyk Dep. at 35-36.)

4

disorderly conduct on September 16, 2006 and the remaining charges were dismissed.  On May 31, 2006, Brian was indicted by a grand jury on charges of assault on a police officer and resisting arrest. On January 16, 2007, he pled "no contest" to resisting arrest, in return for dismissal of the felony charge. During the plea proceeding, as reflected in the transcript, he agreed to waive all claims against the City and its officers.

On May 28, 2008, Brian and Derek filed this lawsuit. In count one of the complaint, they allege that defendants violated their Fourth Amendment right to be free from excessive force. They further allege that the City of Akron, defendant Matulavich, and defendant Schnee, by their indifference, implicitly authorized the unconstitutional conduct of the other defendants, failed to sufficiently train the other defendants, and failed to supervise them. In count two, plaintiffs assert a civil rights conspiracy claim under 42 U.S.C. § 1985. In count three, they allege intentional infliction of emotional distress. In count four, plaintiffs allege negligent training, supervision and retention.

Defendants have filed a motion for summary judgment on the issue of qualified immunity as it relates to their alleged use of force.[8]

---

[8] The Court bifurcated summary judgment practice in order to resolve the question of qualified immunity first. *Skousen v. Brighton High School*, 305 F.3d 520, 526 (6th Cir. 2002) ("entitlement to qualified immunity involves immunity from suit rather than a mere defense to liability") (citing *Siegert v. Gilley*, 500 U.S. 226, 233 (1991)).

## II. DISCUSSION

### A.    Brian Patterson's Claims

Defendants argue that Brian Patterson waived his § 1983 claim of excessive force and that, in any event, he is barred from bringing the claim under *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).[9]

Brian Patterson was indicted for the felony of assault on a police officer and the misdemeanor of resisting arrest. Represented by counsel, he agreed to a *nolo contendere* plea on the misdemeanor and, in exchange for the dropping of the felony charge, he also entered into a Release-Dismissal Agreement. On the record at the plea proceeding, he represented that he had agreed "not to institute any lawsuit against any of the police officers involved or the City of Akron in this case." (Motion, Exh. M, Item No. 1 at p. 6.)

The Supreme Court has held release-dismissal agreements valid so long as certain criteria are met: (1) the agreement was entered into voluntarily; (2) there is no evidence of prosecutorial misconduct; and (3) enforcing the agreement furthers the public interest. *Town of Newton v. Rumery*, 480 U.S. 386, 397 (1987); *see also Burke v. Johnson*, 167 F.3d 276, 285 (6th Cir. 1999) (burden of preponderance of evidence is on the party asserting the defense).

Voluntariness is determined based on (1) the sophistication of the criminal defendant; (2) whether the defendant was in custody when the agreement was made; (3) whether the defendant was represented by counsel who drafted the agreement; (4) whether there was ample time for the defendant to consider the agreement before signing it; (5) the nature of the

---

[9] These arguments have nothing to do with qualified immunity and should have been raised in a motion to dismiss. Nonetheless, because the issues have been fully briefed and reviewed by the Court, and in the interest of conserving judicial resources, the Court will address the issue of waiver.

6

criminal charges; and (6) whether the agreement was formed under judicial supervision. *Kinney v. City of Cleveland*, 144 F.Supp.2d 908, 916 (N.D. Ohio 2002) (summarizing *Rumery*).

Brian argues that he was not a sophisticated criminal defendant because he had never been arrested or charged with a criminal offense, had only two years of college and worked as a landscaper. This argument has no merit given the clear questioning of the state court judge and Brian's answers, as reflected in the transcript of those proceedings:

> THE COURT:   All right. Also as a condition of the plea bargain in this case that is in consideration of you being offered a plea to the misdemeanor and not the felony charge, it is the Court's understanding that you have agreed in return for that consideration not to institute any lawsuit against any of the police officers involved or the City of Akron in this case; is that correct?
>
> THE DEFENDANT:   Yes.
>
> THE COURT:   Has anybody forced you, coerced you, or promised you anything in order to get you to make that decision?
>
> THE DEFENDANT:   No.
>
> THE COURT:   And that has been a decision made of your own volition and free will?
>
> THE DEFENDANT:   Yes.

(Motion, Exh. M., Item 1 at p. 6.)

Brian further argues that his alleged lack of sophistication was exacerbated by his counsel's inexperience. He provides proof that, at the time of the plea proceeding, his counsel had graduated from law school less than a year before and had practiced for only five weeks.[10] This argument also has no merit because, when questioned at the plea proceeding as to whether he was "satisfied with the legal representation that [he had] received[,]" he answered "Yes."

---

[10] In fact, these were the credentials of his stand-in counsel at the proceedings; he was actually represented by three retained attorneys, two of whom were experienced.

(Motion, Exh. M, Item No. 1 at p. 5.) Furthermore, there is nothing to indicate that he was represented by a public defender; therefore, since he chose his own counsel, presumably he would have sought new counsel if he truly were dissatisfied with counsel's representation and/or credentials.

Finally, Brian argues that he was under the impression from what his counsel told him that the waiver was only temporary and would be expunged when his conviction was expunged. He offers no support for this argument.[11] This argument has no merit because, aside from complete lack of proof, there is nothing in the transcript of the plea proceeding to show that Brian told the state court judge that he was under the impression that his waiver was temporary and only enforceable until his conviction was expunged. When asked whether anyone had promised him anything in order to secure his plea, he answered in the negative. Since the prosecuting attorney had specifically mentioned the possibility of expungement of his record in the future, *see* n. 8, it is not unreasonable to expect that, if Brian and his attorney thought his waiver was also to be "expunged," they would have sought clarification in open court before he agreed to the waiver in return for the dropping of the felony charge. Further, even when the state court judge asked him: "Is there anything you want to say to the Court?", he answered in the negative. (Motion, Exh. M, Item No. 1 at p. 7.)

---

[11] There is some suggestion in the transcript of the plea proceeding that the state would not oppose a motion for expungement. ("And the State has no objection if he stays out of trouble and files an expungement in the future, Your Honor." Motion, Exh. M., Item No. 1 at p. 3.) Apparently, Brian's criminal file was sealed by order of the Common Pleas Court dated July 24, 2008. (Opposition Brief, Exh. 19.) He has filed a declaration stating that he had told his counsel that he would not sign a release, but counsel informed him 15 minutes before his plea hearing that he would have to agree to an oral waiver. (*Id.*, Exh. 9, ¶ 5.) This declaration does not establish anything, especially in the face of his exchange with the state court judge during the plea proceeding. Further, Brian has presented no affidavits from his criminal defense attorneys indicating that they ever told him that expungement of his record would also expunge any oral waiver he made on the record in open court. His self-serving declaration alone is not enough to overcome the clear transcript of his plea proceeding and/or to create an issue of fact.

The transcript of the plea proceeding clearly establishes that Brian entered into an oral agreement voluntarily. He possesses the requisite sophistication, was not in custody, and was represented by counsel who informed him of what the agreement entailed and of the rights he was waiving. The state court judge, who examined him on the record regarding the substance of the agreement, the waiver of certain rights and the absence of coercion, confirmed that Brian's decision was knowing and voluntary.

Brian also fails to show (and does not even argue) that there was any prosecutorial misconduct involved in obtaining his waiver or that it would not be in the public interest to uphold the waiver.

The Court concludes that Brian's § 1983 claim against the City of Akron and the defendant police officers must be dismissed with prejudice because it was waived when Brian agreed "not to institute any lawsuit against any of the police officers involved or the City of Akron in the case[.]"

Further, although the defendants have made their waiver argument only with respect to the § 1983 claim (Count I), in this Court's view, all of Brian's claims relating to this incident were waived, including any claim of conspiracy under § 1985 (Count II) and his two state law claims of intentional infliction of emotional distress (Count III) and negligent training, supervision, and retention (Count IV). If that were not so, the waiver given in open court in exchange for the dropping of the felony charge would be practically meaningless. Clearly the intent was that the plea proceeding would put an end to this matter, at least as to Brian.

9

As discussed above, all of the claims made by Brian Patterson against all of the defendants are DISMISSED with prejudice because they were voluntarily waived at the time Brian entered a plea of no contest to the charge of resisting arrest.[12]

**B.    Qualified Immunity**

Defendants argue that they are entitled to qualified immunity with respect to plaintiffs' excessive force claims.[13]

"In order to prevail in a § 1983 action for civil damages from a government official performing discretionary functions, the defense of qualified immunity that our cases have recognized requires that the official be shown to have violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Conn v. Gabbert*, 526 U.S. 286, 290 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Through the use of qualified immunity, the law shields 'governmental officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). Qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

Qualified immunity analysis proceeds in two stages. First, the Court must consider the "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If that question is answered in the affirmative, the Court next

---

[12] Given the Court's disposition of Brian's claims on the basis of the release-dismissal agreement (i.e., waiver), the Court need not address whether Brian is barred from bringing his claim on the basis of *Heck v. Humphrey*, *supra*.

[13] Since only Derek's claims remain, the Court will address this defense only as it pertains to Derek.

asks "whether the right was clearly established [. . .] in light of the specific context of the case[.]" *Id*. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). Although the Supreme Court recently held that this two-stage approach is no longer mandatory, it "continue[s] to recognize that the *Saucier* protocol is often beneficial." *Pearson v. Callahan*, -- U.S. --, 2009 WL 128678, at *9 (U.S. Jan. 21, 2009).

When a defendant raises a qualified immunity defense, the burden is on the plaintiff to prove that the officers are not shielded by qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

The standard for qualified immunity in an excessive force context is one of "objective reasonableness" under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989). However, as the Sixth Circuit noted in *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), this standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Id.* at 944 (citing *Graham*).

The use of more force than is necessary is not permitted whether or not an arrest is lawful, *Graham*, 490 U.S. at 394 (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)), but the reasonableness of the force used to make an arrest "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. There is no hard and fast test for determining reasonableness. The determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by

11

flight." *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990) (citing *Graham*, 490 U.S. at 396).

The issue is whether  Derek's arrest  was carried out using excessive force. There is little agreement between the officers and Derek about how his arrest proceeded. About the only fact the officers and Derek agree upon with respect to Derek's arrest is that, once he inserted himself into the arrest of his brother, he refused to follow their directions and allow them to handcuff him. Derek pled no contest to disorderly conduct, so the legality of his arrest is not at issue.

Derek claims that he was drive stunned repeatedly, even after he was handcuffed and under control. There are photos of his injuries which might be consistent with taser wounds. (*See*, Doc. No. 51-19.) The officers deny drive stunning Derek after he was handcuffed.

Although "[t]he Sixth Circuit  consistently holds that the gratuitous use of force on a suspect who has already been subdued is unreasonable[,]" *Hughes v. Kelley*, No. 4:04-CV-129, 2006 WL 1207997, at *4 (W.D. Mich. May 1, 2006) (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (unreasonable for officers to to use pepper spray on suspect who was handcuffed on the ground but continued to squirm and kick his feet in the air), in this case, given this significant factual dispute and the Court's inability to make fact calls on summary judgment, the Court cannot yet conclude whether the officers are entitled to qualified immunity.[14] It is not possible, without making factual determinations, to decide whether there was a constitutional violation for purposes of the qualified immunity analysis. *Bass v. Robinson*, 167 F.3d 1041, 1046 (6th Cir. 1999) ("'it is impossible to determine, without

---

[14] In his opposition to the motion for summary judgment, Derek argues that defendants Givens, Evans, Bickett, Didyk, and Rinn each either used excessive force or was present during another officer's use of excessive force and failed to intervene. The Court does not find any such allegation in the complaint (Doc. No. 1) and, therefore, will not consider any "failure to intervene" claim.

12

choosing between the parties' sharply different factual accounts, whether the force the officers used, objectively assessed, was reasonable.'") (quoting *Jackson v. Hoylman*, 933 F.2d 401, 403 (6th Cir. 1991)); *see also*, *Tapp v. Banks*, 1 Fed.Appx. 344, 350-51, 2001 WL 45103, at **5 (6th Cir. 2001) (although it is objectively reasonable that an officer would be "agitated and highly apprehensive" in certain circumstances, "it is not objectively reasonable for an officer dealing with an essentially compliant person to strike the person's legs twelve to fifteen times in the absence of resistance.") (footnote omitted).

Accordingly, since there are material factual disputes relevant to the issue of qualified immunity, the defendants' motion for summary judgment on this issue with respect to Derek's § 1983 claim is DENIED.

### III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment (Doc. No. 39) is GRANTED IN PART and DENIED IN PART. The Court grants summary judgment in favor of all defendants on all claims brought by Brian Patterson and DISMISSES those claims. However, because there are material factual disputes regarding how the arrest of Derek Patterson occurred, the Court cannot declare that the defendant officers are entitled to qualified immunity on his § 1983 claim. That claim, along with all the other claims of Derek Patterson, must proceed.

By separate order, the Court will schedule a status conference with counsel to determine how to proceed from here.

**IT IS SO ORDERED**.


Dated: August 26, 2009

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**