UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN D. PATTERSON, et al., | ) | CASE NO. 5:08CV1300 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF AKRON, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

Before the Court is defendants' motion for summary judgment (Doc. No. 89), plaintiff's brief in opposition (Doc. Nos. 93, 95), defendants' reply (Doc. No. 96), and plaintiff's sur-reply, filed with leave of Court (Doc. No. 98). For the reasons discussed below, the motion is **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 28, 2008, Brian Patterson ("Brian") and Derek Patterson ("Derek"), who are brothers, filed a complaint against the City of Akron, Ohio ("the City") and several of its police officers asserting claims of excessive force, failure to train, and failure to supervise under 42 U.S.C. § 1983, a conspiracy claim under 42 U.S.C. § 1985, and state law claims of intentional infliction of emotional distress and negligent training, supervision, and retention. (Doc. No. 1.)

The Court fully set forth the facts underlying the complaint in a Memorandum Opinion and Order ruling on defendants' motion for summary judgment on the issue of qualified

immunity. (Doc. No. 66.) This ruling was affirmed on appeal "upon the opinion of the district court." (Doc. No. 72.) Facts sufficient to place the instant ruling in context are set forth below.

On Memorial Day weekend in 2006, Brian and Derek, who both live in Florida, were visiting their parents in the Akron area. On May 27, 2006, they separately went with friends to a bar on West Exchange Street near South Main Street. As people left the bar around 2:15 a.m. on May 28, 2006, they congregated on the sidewalks outside the bar. Accounts of the number of people vary, but it seems likely from the evidence that there were more than a hundred people.

Brian was leaning against a police cruiser parked in front of the bar. Defendant Timothy Givens ("Givens"), an Akron police officer, approached and told Brian not to lean on the cruiser. Brian complied, but shortly thereafter, began leaning on the car again. Givens came back and told Brian to leave the scene or he would be arrested. Brian did not leave, stating that he was not doing anything wrong. Givens, assisted by defendant officers M. Rinn ("Rinn") and D. Bickett ("Bickett"), arrested Brian. Accounts of the arrest differ. Brian claims that he quietly allowed them to arrest him and handcuff him behind his back. The officers claim that he fought them and, even after he was handcuffed, refused to allow them to place him in the cruiser; this is confirmed by the testimony of Brian's friends, Anthony Gary and Kara Monaghan, who witnessed the arrest. While this was occurring, Derek became aware that Brian had been handcuffed; he rushed over to inquire and asked to talk to Brian, which the officers permitted. Brian told Derek that he had done nothing wrong and did not know why he was being arrested.

According to the officers, by this time a yelling inebriated crowd was closing in. Fearing trouble, they moved Brian to the middle of the street, followed by the crowd. Brian claims two officers tried to "body slam" him and then turned him toward a third officer, defendant K. Evans ("Evans"), who shot Brian in the chest with a taser. He fell to the ground and

was "drive stunned" with the taser in his back, left leg and buttocks, while another officer had his knee on Brian's head. People in the crowd began to yell that it was police brutality.

When Derek observed Brian being tased, he "freaked out," running toward the officers ahead of a group of bystanders, intending to pull them off Brian. Before he reached Brian, however, defendant officer P. Didyk ("Didyk") tackled him. Didyk and Bickett grabbed Derek and tried to handcuff him. When Derek resisted, despite clear commands, Didyk drive stunned him on his thigh and buttocks; Derek fell on his face and was handcuffed. Derek claims Bickett drive stunned him at least five more times, once on the back of the head, twice on the back of the neck and twice on his left shoulder. The officers claim that, during this struggle, Brian broke free and kneed Bickett in the head. Meanwhile, an unruly crowd was gathering and yelling obscenities and "police brutality." The officers then pepper sprayed the crowd.

Brian was charged with assault on a police officer, resisting arrest, and disorderly conduct; a grand jury indicted him for assault on a police officer (a felony) and resisting arrest (a misdemeanor). Derek was charged with disorderly conduct, obstructing official business, and resisting arrest. On September 16, 2006, Derek entered a plea of "no contest" to disorderly conduct and the remaining charges were dropped. On January 16, 2007, represented by counsel, Brian entered a plea of "no contest" to resisting arrest, in return for dismissal of the felony charge of assaulting a police officer. During the plea proceeding, Brian agreed to waive all claims against the City and its officers.

On August 26, 2009, this Court ruled that all of Brian's claims must be dismissed with prejudice because of his agreement to waive all his claims. This ruling was affirmed on appeal. In the same order, the Court ruled that there were facts in dispute with respect to whether

Derek's arrest had been carried out with excessive force. This precluded issuing summary judgment on the question of qualified immunity. This ruling, too, was affirmed on appeal.

Following the appeal, this Court set the matter for summary judgment briefing on the merits and on the *Monell* claim against the City. This is the motion that is presently before the Court and ripe for resolution.

## II. DISCUSSION

### A.     Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *White v. Turfway Park*

*Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina College v. Russell*, 499 U.S. 225 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

**B.     Analysis**

    **1.     Count One -- *Monell* Claim Against the City**

The City argues that it is entitled to summary judgment on Derek's Section 1983 *Monell* claim.[1]

---

[1] Count One is also leveled at the individual defendants; they have not moved for summary judgment.

A municipality is liable under 42 U.S.C. § 1983 only if the municipality itself caused the constitutional deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). A municipality cannot be held liable for acts of its employees solely on a theory of *respondeat superior*. *Id.* at 691. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. In other words, the "official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983. *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (quoting *Monell*, 436 U.S. at 694).

"To prevail on a claim of municipal liability under section 1983, [a plaintiff] must establish: 1) that he was deprived of a constitutional right; 2) that the municipality had a 'policy'; and 3) that the policy was 'the moving force' behind the constitutional violation." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 1000 (6th Cir. 1994) (quoting *Monell*).

"There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citations omitted).

The City argues that, even assuming Derek can establish that he was deprived of a constitutional right, he has failed to establish: (1) that a City rule, policy or custom was responsible for that deprivation; (2) that the City has promulgated rules or policies, or had a custom of, directing its officers to unlawfully use a taser on an arrestee who has been subdued

6

and placed under control; (3) that a City policy-making official has possessed knowledge of any history of unlawful use of tasers on subdued arrestees sufficient to establish a custom; (4) that a City official with final decision-making authority directed or authorized the actions of either of the officers (Bickett and Didyk) who utilized the tasers in this case; and/or (5) that the City has deliberately failed to respond "to repeated complaints of constitutional violations by its officers" in their use of tasers on subdued arrestees or that it ignored "foreseeable consequences that could result from the lack of instruction[.]" *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003). Defendants rely upon the affidavit of Sergeant Michael Yohe (Doc. No. 89, Ex. P), wherein he clearly articulates the extensive and comprehensive training officers receive in the use of tasers and the assistance he gives Akron police supervisors in the oversight of taser deployments on suspects.

In opposition, plaintiff relies for the first time upon a theory of ratification, under which, "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Plaintiff argues that the City ratified its employees' unconstitutional acts "by failing to meaningfully investigate those acts."[2] (Doc. No. 93 at 1098, citing *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1985) (finding county ratified employee's unconstitutional act, i.e., failure to provide for medical needs of

---

[2] The Court finds no specific assertion in the complaint of ratification in the form now argued by plaintiff. Rather, the complaint alleges that the City, the police chief, and Schnee had "notice or constructive notice of persistent patterns, policies, practices, and customs of the City Police Department and its officers, including Defendant Officers, to deprive citizens of their right to be free from the use of excessive force. The deliberate indifference ... to the failure of their officers to use force which is reasonable constitutes an official policy which was the moving force behind the deprivation of Plaintiffs' rights. By their indifference, these Defendants implicitly authorized, approved, and knowingly acquiesced in the unconstitutional conduct against Plaintiffs." (Compl. ¶ 29.) The complaint further alleges that the City, the police chief and Schnee "had prior notice of the offending Officers' propensity to engage in unconstitutional conduct, but failed to sufficiently train them in proper use of force or to adequately supervise them or discipline them for their misconduct." (Compl. ¶ 30.) There is no mention in the complaint of ratification in the form of failure to meaningfully investigate the acts of the individual defendants.

paraplegic inmate, by not meaningfully investigating employee's conduct); *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985) (finding municipality ratified sheriff's deputy's unconstitutional act, i.e., beating of an inmate, by failing to meaningfully investigate act).)

Plaintiff argues that a ratification claim has two elements: (1) that a final policymaker approved an investigation that (2) was so inadequate as to constitute a ratification of the alleged constitutional violation. (Doc. No. 93 at 1099-1100, citing *Wright v. City of Canton, Ohio*, 138 F. Supp. 2d 955, 966, 967 (N.D. Ohio 2001) (where a judge of this court concluded that "the investigation was not designed to discover what actually happened") and *Rush v. City of Mansfield*, 771 F. Supp. 2d 827 (N.D. Ohio 2011) (same).)

Plaintiff asserts that defendant Schnee's investigation of the officers' use of force "had the rubber stamp approval of Major Craig Gilbride, the commanding officer, in 'the unbroken line of authority from the Chief of Police downward through a single subordinate at each level of command ....'" (Doc. No. 93 at 1100.)[3] "Under Ohio Revised Code § 737.12, the chief of police is the final policymaker with regard to investigations that do not result in disciplinary action." *Wright*, 138 F. Supp. 2d at 966. Since there was no disciplinary action in this case, plaintiff argues that Police Chief Matulavich's approval of the investigation into the matter constitutes municipal policy and is a ratification of the unconstitutional use of force by the defendant officers.

Plaintiff further asserts that whether Gilbride rubber-stamped Schnee's investigation is, at the very least, a question of material fact. Plaintiff argues that the

---

[3] Although this material is in quotation marks in plaintiff's brief, he does not supply a source for the quotation. He seems to be asserting that, because Gilbride allegedly "rubber stamped" an allegedly deficient investigation by Schnee, that "ratification" travels up the line of authority and is attributed to the chief of police, the final policymaker. Gilbride is not a party to this action. Further, there is no allegation that either Schnee or Matulavich used any excessive force. Their sole involvement with respect to the *Monell* claim was their role in the investigation of the incident.

department's own internal policy required that someone other than Givens, who was involved in the use of force, had to investigate the incident; but it was Givens who took Derek's statement on the night in question, at Schnee's direction. A week later, also at Schnee's direction, Givens took the statements of the three valets who witnessed the incident, inquiring not about the officers' actions but only about the crowd. No member of the general crowd was interviewed,[4] nor were the other officers who came to the scene.[5] According to plaintiff,

> Lt. Schnee simply accepted the written statements of Givens, Bickett, Evans and Didyk, the officers who decided to make use of their tasers. It was required by the Department's internal policy and crucial to an actual investigation into whether the specific force used was necessary, to interview bystanders, strangers to the events, who had a view of the activities. It would have been appropriate and helpful to ask the involved officers questions, to interrogate them, not simply accept their written statements. It would have been appropriate and helpful to question the officers who did not provide statements. Lt. Schnee did none of this. It was not appropriate or helpful to permit Givens, who regularly patrolled the bar district to interview the three bar valets (R. 51-10, Givens Depo. pg. 35-36), all of whom were stationed outside of [the bar] where Bickett was working that day.

(Doc. No. 93 at 1102.) Plaintiff concludes that, construing these alleged "facts" in the light most favorable to him, a reasonable jury could find that the City ratified the defendants' use of a taser on an incapacitated, unarmed individual posing no threat to the officers or others, by approving an investigation "not designed to discover what [really] happened." (*Id.*, quoting *Rush*, 771 F. Supp. 2d at 864.)

In reply, the City points out that plaintiff has made assertions and arguments, but has failed to cite to any Rule 56(c)-type evidence in the record to support those assertions and

---

[4] One of Brian's friends who witnessed the arrests, Anthony Gary, was interviewed and a tape of that interview is in the record. *See* Doc. No. 39, Ex. E, Item 2, manually filed at Doc. No. 40.

[5] According to plaintiff's reading of the various Use of Force Reports, the following officers were on the scene: Didyk, Bickett, Evans, Givens, Rinn, Kubasek, Burton, Rea, Enlehart, Donahue, Meech, and Ullman. (Doc. No. 93 at 1094, n. 6.)

arguments. In particular, according to defendants, plaintiff has failed to produce any evidence to establish a genuine issue of material fact with respect to whether the investigation was designed to discover the facts surrounding the use of force. In any event, defendants argue, Schnee's affidavit supplies sufficient evidence that a thorough and meaningful investigation was conducted, notwithstanding plaintiff's disagreement with the outcome.

In his sur-reply brief, plaintiff argues that defendants have misstated the legal standard for a federal ratification claim. Plaintiff further argues that "[f]rom discrepancies in the record and missing pieces in the investigation a fact finder can well conclude that Lt. Schnee's investigation was not designed to discover whether the use of force against [Derek] was appropriate but rather to wash over the fact that the officers may have used excessive force." (Doc. No. 98 at 1223.) Plaintiff asserts that, contrary to defendants' argument, Schnee did not conduct the "entire investigation," but directed Givens, who was involved in the use of force, to conduct important parts of the investigation, namely, the interviews of Derek and, one week later, of the three valet witnesses. In other words, Givens conducted four of the six interviews done in the investigation. Plaintiff argues that, in interviewing the valets, Givens "did not ask questions which would identify the subjects of the tasering or ask for details as to what actions preceded each use of force, what exactly the valet saw and heard, where he was in relation to the acts observed, the number of officers he saw in the street and on the sidewalk and their location, the number of police cars and location, the location of any obstruction to his view, and how they were able to see the events." (*Id*. at 1224.) According to plaintiff, since Givens conducted the interviews of the valets several days after the incident, he had plenty of time to plan the interviews and his failure to question in detail "was not due to haste or the exigencies of the moment." (*Id*.) Schnee did not interview the officers who used the force, but simply relied on

10

their written reports. Schnee did not interview any of the other officers who were on the scene, purportedly because the events were "clearly described" in the use of force reports of the offending officers. However, according to plaintiff, there are discrepancies in the use of force reports, and even in Schnee's own investigative report. Plaintiff also argues that the security camera footage, which Schnee dismissed as containing no useful information, actually shows that the situation was under control with respect to bystanders. Schnee did not interview any of the bystanders.

The Court is inclined to agree with plaintiff that there are material factual disputes as to the adequacy of the investigation conducted by Schnee.[6] Although the factual scenario underlying this case is not quite as dramatic as the scenarios in the three cases relied upon by plaintiff, *Wright*, *supra*; *Rush*, *supra*; *Phelps v. City of Akron*, No. 5:04 CV 2490, 2006 WL 2945947 (N.D. Ohio Oct. 13, 2006), there are similarities and the cases do provide some guidance. *Wright* suggests that Schnee's failure to conduct interviews of the officers at the scene, coupled with her allowing Givens to conduct the interviews of both Derek and the three valet

---

[6] Although defendants argue that plaintiff has failed to produce Rule 56-type evidence to support his assertion that he should prevail against the City on the basis of ratification or even to establish that there are material facts in dispute with respect to this issue, the Court concludes that the sur-reply brief, although not giving pinpoint citations to the record, does point generally to evidence this Court knows to be in the record. Although the Court would have preferred pinpoint citations to the record and failure to provide those suggests a less than rigorous approach by counsel, granting summary judgment because of lack of citations to a record that the Court knows exists would exalt form over substance.

The Court finds it problematic that Schnee instructed Givens, who was involved in the use of force against Brian, to conduct critical interviews. Obviously, he had an interest in steering the interviews in a fashion that could exonerate him and the other officers; whether or not he did so is a question of fact for the jury. Even though defendants assert that it was permissible for him to do the interviews because he was only involved in the force used on Brian, whose claims are no longer at issue in the case, at the time the interviews were conducted no one could have known that Brian would eventually be dismissed from any possible lawsuit. The Court is also concerned that Schnee did not interview the other officers on the scene who had not been directly involved in the use of force. Surely, to varying degrees, they observed what had transpired and might have been able to supply useful factual input, especially with respect to what was happening with bystanders. It is not clear whether interviews of bystanders themselves would have been helpful; but it seems to defy logic that no bystander was interviewed on the night of the events in question, given the numbers of officers on the scene and given the officers' consistent insistence that their behavior was guided at least in part by the threatening nature of the large crowd.

witnesses, was questionable from an investigative standpoint.[7] Both *Rush*[8] and *Phelps*[9] suggest that the investigation conducted by Schnee may have had so many holes that a fact finder could conclude that it was not a meaningful investigation and that she had merely gone through the motions so as to exonerate the officers.

That said, if, for the sake of argument, this Court were to conclude *both* that there was a constitutional violation *and* that Lt. Schnee's investigation of that violation was

---

[7] In *Wright*, another judge of this court denied defendants' motions for summary judgment in a case against two officers and a city wherein excessive force during an arrest was alleged. The plaintiff in *Wright*, who suffered very severe injuries, sought to hold the city liable on a theory that it had ratified an unconstitutional use of force by failing to adequately investigate the officers' conduct. In *Wright*, the record showed that the investigator (1) never interviewed the emergency room doctor who had a nurse call the city police department after both seeing the extent of Wright's severe injuries and hearing the officers involved change their stories upon his questioning, (2) never inquired of the doctor as to the extent of Wright's injuries, and (3) never inquired as to the behavior of the two accused officers. The investigation was concluded without knowledge that the emergency room doctor insisted that the police officers had given three different stories as to how Wright may have suffered his injuries and that the emergency room doctor believed Wright had not been injured as a result of a single takedown.

[8] In *Rush*, a civil rights action was brought against the City of Mansfield, Richland County, Ohio and various officers following the execution of a nighttime search warrant that resulted in the death of the plaintiffs' decedent. Another judge of this court denied the city's motion for summary judgment, concluding that "a reasonable jury could find that the City of Mansfield ratified [Detective] Bosko's unconstitutional actions by approving an investigation 'not designed to discover what actually happened.'" *Rush*, 771 F. Supp. 2d at 864 (quoting *Wright*, 138 F. Supp. 2d at 967). The judge noted that the investigating officer failed in the following respects: (1) he made no determination as to whether the officer who had obtained the search warrant had relied appropriately upon confidential informants; (2) he made no determination as to whether, under the circumstances, it was appropriate to call a SWAT-type team to execute the nighttime warrant; (3) he determined that the residents knew it was the police based on the testimony of two police officers outside the household, despite contrary testimony from the residents; (4) he separately interviewed all of the residents immediately after the events, but did not separate the law enforcement officials from each other after the shooting; (5) he relied on law enforcement statements prepared several days after the shooting, as opposed to interviews, to determine what had occurred from the perspective of the officers at the scene, notwithstanding his lack of knowledge as to whether attorneys had helped any of the officers prepare these statements; (6) he took a walk-through with the officers and the officers' attorneys during daylight to see what had happened, but recorded no statements made by the officers during that walk-through and could remember no such statements; and (7) he concluded that Gilbert Rush had shot first although officers testified during the court proceedings that they had shot first. Although the underlying facts and investigative errors in *Rush* are significantly more egregious than in the instant case, *Rush* does point to the inadequacy of an investigation that clearly has holes that need to be filled.

[9] In *Phelps*, the plaintiff alleged that his constitutional rights were violated when he was beaten and attacked by an Akron police officer after his arrest on November 20, 2002 for possession of drug paraphernalia. Defendants moved for summary judgment. They argued, *inter alia*, that there could be no municipal liability based on a theory of ratification. Plaintiff asserted that ratification could be found because the supervisor who conducted the investigation, which exonerated the arresting officer, had a conflict of interest because he was the officer's direct supervisor. The court rejected that argument, but nonetheless found that summary judgment was precluded because, relying on *Wright*, the fact that the investigating officer had "made no effort to contact anyone other than [the arresting officer] demonstrates a lack of any meaningful investigative process." *Id.* at * 9.

inadequate, that would still not preclude summary judgment for the City. As noted by the very case plaintiff relies upon to prove municipal liability under an "inaction" or ratification theory, plaintiff would also have to "show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the [constitutional violation] here." *Thomas*, 398 F.3d at 433 (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

As noted by the court in *Thomas*, there is danger in "attempting to infer a municipal-wide policy based solely on one instance of potential misconduct." *Id*. at 432. "This argument, taken to its logical end, would result in the collapsing of the municipal liability standard into a simple *respondeat superior* standard. This path to municipal liability has been forbidden by the Supreme Court." *Id.* at 432-33 (citing *Monell*). Further, "*Doe* makes clear that the plaintiff bears a heavy burden in proving municipal liability, and he cannot rely solely on a single instance to infer a policy of deliberate indifference." *Id*. at 433. In *Doe*, the court "found that even where a school board had some information that one of its teachers may have sexually abused students in the past and the board failed to remove him before he abused the plaintiff, the school board could not be found liable for having a policy, custom, or practice of condoning such abuse because there was no evidence that the school board failed to act regarding other teachers in similar circumstances; thus there was no evidence of any deliberate pattern." *Id.* (citing *Doe*, 103 F.3d at 508). Further, "[t]here is an analytical distinction between being deliberately indifferent as to one particular incident, and having a 'policy' of always being deliberately indifferent to unconstitutional actions." *Doe*, 103 F.3d at 508.

Here, plaintiff has presented no evidence of the City failing to act or inadequately investigating the use of force or the use of tasers by other officers. Without any citation to record evidence, plaintiff merely asserts in his opposition brief that "[t]his is not the first time that Akron's Police Department failed to adequately investigate its police officers' arguably excessive use of force on citizens whot [sic] had not committed a serious offense, were unarmed and posed no threat of physical harm to the officers or anyone else." (Doc. No. 93 at 1103.)

The Court concludes that the City is entitled to summary judgment on Count One of the complaint given the absence of this critical evidence.

### 2. Count Two -- Conspiracy

The individual defendants argue that they are entitled to summary judgment on Derek's Section 1985 conspiracy claim.

Section 1985(3) creates no substantive rights, but simply affords a civil remedy for private conspiracies to deprive persons of their civil rights. *Volunteer Med. Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 225-26 (6th Cir. 1991). To establish a claim under Section 1985, a plaintiff must prove that defendants (1) conspired (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, and that (3) one or more of the conspirators committed an act in furtherance of the conspiracy, (4) whereby another was injured in his person or property. *Griffin v. Breckinridge*, 403 U.S. 88, 102-03 (1971); *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994). Further, for section 1985(3) to apply, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102.

Plaintiff's complaint is not specific about the conspiracy count, merely alleging that the defendants "conspired together and with each other" to deprive Brian and Derek "of their

equal protection of the law as African-American males and Fourth and Fourteenth Amendment rights to be free from excessive force." (Compl. ¶ 33.)

Defendants argue that, to the extent a conspiracy may have been properly pled, it would be barred by the "intracorporate conspiracy doctrine." A conspiracy requires two or more persons. "[W]here all of the defendants are members of the same collective entity, there are not two separate people to form a conspiracy." *McCrary v. Ohio Dep't of Human Servs.*, No. 99-3597, 2000 WL 1140750, at * 3 (6th Cir. Aug. 8, 2000) (citing *Hull v. Cuyahoga Valley Joint Voc. Sch. Dist. Bd. of Educ.*, 926 F.2d 505 510 (6th Cir. 1991)).

Plaintiff has offered no opposition to this portion of defendants' motion for summary judgment. The Court finds well-taken defendants' argument that plaintiff has failed to establish a conspiracy claim and, therefore, defendants are entitled to summary judgment on Count Two.

### 3. Count Three -- Tort Claim: Intentional Infliction of Emotional Distress

The individual officers argue that they are entitled to summary judgment on Derek's state law tort claim of intentional infliction of emotional distress.

First, the officers argue that they are entitled to immunity under Ohio Rev. Code § 2744.03(A)(6) which provides immunity to City employees unless one of the following applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Defendants argue that they were acting within the scope of their employment and official responsibilities with the City and that Derek has not asserted that any statute expressly imposes liability. Therefore, they can only be liable, if at all, for acting with malicious purpose, in bad faith, or in a wanton or reckless manner, Ohio Rev. Code § 2733.03(A)(6)(b), which they claim Derek cannot establish.

Even if they are not immune, defendants argue that Derek is unable to prove the elements of the tort of intentional infliction of emotional distress: "1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it can be considered as 'utterly intolerable in a civilized community,' Restatement of Torts 2d (1965) 73, Section 46, comment d; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it,' Restatement of Torts 2d 77, Section 46, comment j." *Pyle v. Pyle*, 11 Ohio App. 3d 31, 34 (Ohio Ct. App. 1983).

In opposition, plaintiff argues that genuine issues of material fact exist regarding the application of Ohio Rev. Code § 2744.03 to their conduct. He further argues that he has presented sufficient evidence to raise genuine issues of material fact as to the nature and extent of his emotional injury.

The Court concludes, as the individual defendants argue, that they are entitled to immunity under Ohio Rev. Code § 2744.03 because they were acting within the scope of their employment and responsibilities and are not liable under any express statute. Further, there is no

evidence that they acted out of malice or wanton disregard for Derek, even though, in hindsight, someone might conclude that the defendants did not exhibit the best judgment, especially at the earliest stage of the events.[10]

Even if they were not entitled to immunity, plaintiff is unable to meet the very high standard of "extreme and outrageous" conduct required to prove this tort. Ohio courts have made clear that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of America*, 6 Ohio St. 3d 369, 375 (1983), *abrogated on other grounds by Welling v. Weinfeld*, 113 Ohio St. 3d 464 (2007). The facts of this case, even viewed in the light most favorable to the plaintiff, do not meet this test.

Accordingly, the individual defendants are entitled to summary judgment on Count Three.

### 4. Count Four -- Tort Claim: Negligent Training, Supervision, and Retention

The City argues that it is entitled to summary judgment on Derek's state law tort claim of negligent training, supervision, and retention.

As an initial matter, the City correctly argues that, although this count includes Chief Matulavich and Lieutenant Schnee, it does not specifically state whether they are sued in their individual or official capacities. "[A] plaintiff's failure to explicitly state 'individual capacity' in the complaint is not necessarily fatal to the lawsuit." *Rodgers v. Banks*, 344 F.3d 587, 594 (6th Cir. 2003). In that situation a court should "employ a 'course of proceedings' test

---

[10] The Court notes that the entire sequence of events was triggered by Brian leaning on a police car, an event that might be viewed by some as somewhat insignificant.

to ascertain whether a § 1983 defendant was on notice that the plaintiff intended to hold him or her personally liable, notwithstanding the plaintiff's failure to provide explicit notice." *Id.* at 967-68 (citing *Moore v. City of Harriman,* 272 F.3d 769, 772 (6th Cir.2001) (en banc)). The court can look to "the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims for qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability." *Id.* at 968 (citing *Moore,* 272 F.3d at 772 n. 1). Additionally, a court considers "whether subsequent pleadings put the defendant on notice of the capacity in which he or she is [being] sued." *Id.* (citing *Moore,* 272 F.3d at 772 n. 1).

Plaintiff has not addressed this issue in his brief in opposition or his sur-reply. Although the Court notes that Matulavich and Schnee are listed in the caption of the complaint as being sued in both their individual and official capacities, and although plaintiff seeks compensatory and punitive damages, jointly and severally, against all of the defendants, after reading the entire complaint in its own context, in view of the fact that plaintiff has not opposed defendants' assertion that this count is aimed at them only in their official capacities, the Court concludes that defendants' argument has merit. Therefore, since a suit against government officials in their official capacity is really a suit against the government entity itself, Count Four is construed as being brought against the City.

Defendants argue that the City is immune under Ohio Rev. Code § 2744, *et seq.* from state tort causes of action seeking damages relating to police functions. Plaintiff has made no argument in opposition to this assertion by the City and the Court concludes that political subdivision immunity applies. Therefore, the City, and Matulavich and Schnee in their official capacities, are entitled to summary judgment on Count Four.

### III. CONCLUSION

For the reasons discussed above, Doc. No. 89 is **GRANTED**. All that remains for trial in this case is Count One as it relates to the individual defendants.

**IT IS SO ORDERED**.

Dated: September 7, 2012

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**